UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

BRIAN KEITH BARNETT,

Petitioner,

v.

SCOTT KERNAN, Secretary,

Respondent.

Case No.: 17cv209-AJB (BLM)

**(1) REPORT AND RECOMMENDATION FOR ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS;**

**(2) ORDER DENYING PETITIONER'S REQUEST FOR AN EVIDENTIARY HEARING;**

**AND**

**(3) ORDER DENYING PETITIONER'S REQUEST FOR JUDICIAL NOTICE**

**[ECF Nos. 1, 28]**

This Report and Recommendation is submitted to United States District Court Judge Anthony J. Battaglia pursuant to 28 U.S.C. § 636(b) and Civil Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of California. On February 1, 2017, Petitioner Brian Keith Barnett, a state prisoner who is proceeding *pro se* and *in forma pauperis*, commenced these habeas corpus proceedings pursuant to 28 U.S.C. § 2254. ECF No. 1 ("Pet.").

Petitioner challenges his conviction for assault with a deadly weapon.  Id. at 2; see also ECF No. 8-1 ("Answer") at 12.

This Court has considered the Petition, Answer, Traverse [ECF No. 12 ("Traverse")], Supplemental Traverse [ECF No. 22 ("Supp. Traverse")], and all supporting documents filed by the parties.  For the reasons set forth below, this Court **RECOMMENDS** that Petitioner's Petition for Writ of Habeas Corpus be **DENIED**.

## **FACTUAL AND PROCEDURAL BACKGROUND**

The following facts are taken from the California Court of Appeal's April 29, 2016, opinion in People v. Barnett, Appeal No. D065324:

*Prosecution Evidence*

On the night of June 21, 2013, [Petitioner] and Frederick Morao had a loud argument at a residential hotel in San Diego.  The two men were friends and [Petitioner] was temporarily staying with Morao.  Morao had purchased methamphetamine from [Petitioner], and both had consumed "a lot" of "crystal meth" that day.  The men argued about money [Petitioner] claimed Morao owed him for the methamphetamine.

Earlier in the day, Morao had witnessed Barnett hit Devon Clements (a friend of Morao's), with sufficient force to knock him down.  During the argument, Morao told [Petitioner] "I ain't Devon.  You ain't going to hit me like Devon."  One of the two men said something like "We'll handle this," or "[I]et's hit the corner" and Morao walked away from the hotel.  [Petitioner] followed behind.  Morao carried the bottom part of a pool cue (approximately two feet long and two inches in diameter) concealed inside his sweater.  He had it with him because he knew [Petitioner] carried weapons, including a serrated knife with a four-to-five-inch blade.  When [Petitioner] got close to Morao, Morao turned around, thinking [Petitioner] was going to "swing, hit me some kind" and "swung too," swinging the pool cue at [Petitioner].  [Petitioner] was able to disarm Morao of the pool cue before being struck.  Morao then began throwing punches at [Petitioner], many of which landed.

Clements followed slowly behind the men and saw [Petitioner] holding a cylindrical object about a foot and a half long during the fight. Clements initially stated he did not see [Petitioner] use the object on Morao, but later testified it did make contact with Morao. Clements originally described the object as looking like a rolling pin and testified it was wider than the pool cue. Morao felt blows to his chest and stomach during the fight. The brief fight stopped when Morao felt like he "got enough hits in," and Morao and [Petitioner] separated. [Petitioner] walked away limping and yelling something. Morao joined Clements and said something like "I got him." The two men gave each other "daps," a celebratory gesture. Morao and Clements then walked back toward the hotel and Morao realized he was bleeding heavily. After Morao reached the lobby, the hotel security guard called an ambulance. Morao lost consciousness after the paramedics arrived and the next thing he remembered is waking up after surgery. Morao remained in the hospital for a week.

Morao had multiple stab wounds, at least one to the left side of his stomach and one on his back. A doctor told Morao there were 14 stab wounds. Clements also recalled hearing from a police officer that Morao was stabbed 14 to 16 times and might not make it. In addition, the investigating officer, Detective Tews, recalled hearing from police officers at the scene that Morao was stabbed 14 times, but was unable to personally verify the number.

Detective Tews interviewed Morao. Morao initially told Detective Tews he had been jumped by two Hispanic men. Morao had prior felony convictions including theft, possession of methamphetamine for sale, petty theft with a prior, and robbery. He used his "felon mentality" when first speaking with the police. After learning about surveillance video of the incident, Morao told Detective Tews the truth about what happened, explaining he made up the initial story because he did not want to be a rat.

Detective Tews also interviewed [Petitioner]. [Petitioner] denied stabbing Morao. [Petitioner] told Detective Tews Morao tried to hit him with a pool cue, he took the cue away, Morao ran and was then attacked from behind by a "Hispanic dude." [Petitioner] admitted he always carried a knife and he had a black, foot-long, serrated knife with him at the time of the incident, but denied using the knife on Morao.

3

On June 21, 2013, Morao was either 5'3" or 5'7" and weighed around 205 or 210 pounds. [Petitioner] is significantly taller than Morao. Morao felt threatened by the size disparity due to [Petitioner's] advantage of height and "reach." Morao was very soft spoken and nervous during [Petitioner's] cross-examination. Morao does not like weapons, does not know anything about knives, and does not need a knife. However, [Petitioner] had promised to get Morao a knife.

*Section 1118 Motion for Acquittal*

At the close of the prosecution's case, [Petitioner] moved for acquittal under section 1118. He argued there was insufficient evidence to show he used a knife. He further argued evidence showed Morao had a concealed pool cue, which he attempted to strike [Petitioner] with, [Petitioner] took the cue away from him and Morao swung and hit [Petitioner] 20 times. [Petitioner] asserted he "had an absolute right to defend himself" under those circumstances. The trial court denied the motion, noting although evidence established Morao (the smaller individual) initially had a pool cue, any force Morao used after being disarmed "did not justify the deadly force that [Petitioner] used when he stabbed him in the gut." The court therefore ruled there was sufficient evidence for a reasonable jury to find [Petitioner] guilty.

*Defense Evidence*

[Petitioner] represented himself. [Petitioner] first called Dr. Murphy, a forensic psychologist, who testified about the fight or flight syndrome and similar responses of people using crystal methamphetamine. [Petitioner] also called San Diego Police Officer Carlos Munoz (Officer Munoz), who had written a report of the incident stating Morao was stabbed 14 times. Hospital staff had informed Officer Munoz of the 14 stab wounds, but the specific source was not identified in his report and he could not recall who it was. Officer Munoz did not take pictures of any of the stab wounds.

[Petitioner] took the stand. He described his relationship with Morao as one in which Morao depended upon him to "help him out" by supplying crystal methamphetamine and testified he would come from various locations in Southern

California, at his own expense, to supply Morao. The fight with Morao occurred because Morao was angry that [Petitioner's] friends would not give him a cheap price on illegal drugs. When Morao said "Let's go handle it," [Petitioner] anticipated a fistfight and believed he "ain't got not problem," as he was "fixing to whip this little chump's ass, you know, for crossing me up, plain and simple." [Petitioner] was not worried about fighting the younger Morao, a "guy in his prime," because "[m]ost youngsters these days, they don't even know how to sling the fist. They can't even fight. You know, I [was] brought up using my hands to defend myself."

[Petitioner] was attacked by Morao and "just defended [him]self." After [Petitioner] took the pool stick away from Morao, Morao ran and [Petitioner] did not pursue him. At the time, [Petitioner] saw Clements was following behind, and thought he was going to try to help Morao, but was not worried about being "double team[ed]" by the men. [Petitioner] had a gun in one of his back pockets during the incident, but had no intention of using it. [Petitioner's] "big ol' knife" was in his other back pocket. [Petitioner] was "hit in the nose" by Morao, and there was some bleeding.

[Petitioner] testified he used only his fists on Morao and did not stab him. Instead, Morao was stabbed by a Hispanic male after [Petitioner] disarmed him and Morao ran off into the street. After [Petitioner] took Morao's weapon away, Morao "turned around and he got stabbed."

Lodgment 8 at 2-7 (internal footnotes omitted).[1]

Following the trial, the jury found Petitioner guilty of assault with a deadly weapon. Id. at 2; Lodgment 3 at 168. The jury also found true that Petitioner personally inflicted great bodily injury upon Morao and personally used a dangerous or deadly weapon within the meaning of

---

[1] This Court presumes the state court's factual determinations to be correct absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003); see also Parke v. Raley, 506 U.S. 20, 35 (1992) (holding findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness).

5

California Penal Code sections 12022.7(a) and 1192.7(c)(23). Lodgments 8 at 2; 3 at 168. On January 29, 2014, the trial court sentenced Petitioner to seventeen years in state prison. Lodgment 1-12 at 1883.

On December 5, 2014, Petitioner appealed his conviction, arguing that the trial court committed reversible error by: (1) denying his motion for acquittal under section 1118.1 because there was insufficient evidence to find Petitioner did not act in self-defense, and (2) prejudicially instructing the jury regarding self-defense after an attacker is disabled or danger ceases (CALCRIM No. 3474). Lodgment 5. On April 29, 2016, the California Court of Appeal affirmed Petitioner's conviction. Lodgment 8. On June 3, 2016, the date of Petitioner's petition for review in the California Supreme Court, Petitioner reasserted the same claims raised in his appeal. Lodgment 9. On July 27, 2016, the California Supreme Court denied the petition for review without a statement of reasoning or citation to authority. Lodgment 10.

On January 29, 2014, the date Petitioner was sentenced, Petitioner filed a Petition for Writ of Habeas Corpus in the California Court of Appeal arguing that (1) his Faretta rights to due process and equal protection were violated when the county jail made decisional and statutory law available via a "kiosk" separate from the desktop with a word processer and denied him access to confidential legal phone calls and black ink pens, and (2) the thumb drive and media disc provided by the prosecution did not function, he could not contact the court clerk to calendar a hearing or obtain sufficient copies of documents for service, and the prosecutor had denied receiving his motions. Lodgment 11. On January 31, 2014, the California Court of Appeal denied the Petition as untimely, explaining that Petitioner "should have brought his complaints to the attention of the trial court before – not after – he proceeded to trial and was convicted" and that if Petitioner continued experiencing problems in filing and serving post-trial pleadings, he "should seek the trial court's assistance." Lodgment 12.

On May 9, 2016, Petitioner filed a second Petition for Writ of Habeas Corpus in the California Court of Appeal, arguing that: (1) the prosecutor knowingly and intentionally withheld exculpatory evidence, or alternatively, destroyed it before trial and (2) the prosecutor knowingly

elicited and permitted the introduction of false testimony that the exculpatory evidence referenced in ground one does not exist. Lodgment 13. On May 17, 2016, the California Court of Appeal denied the petition, noting that Petitioner demonstrated neither the materiality of the alleged undisclosed information nor that the police or prosecution were acting in bad faith. Lodgment 14.

On August 18, 2014, Petitioner filed a Petition for Writ of Habeas Corpus in the California Supreme Court, arguing that the California Court of Appeal erred in finding that Petitioner did not raise his allegations of <u>Faretta</u> rights violations to the trial court's attention. Lodgment 15. On October 15, 2014, the California Supreme Court denied the petition without a statement of reasoning or citation to authority. Lodgment 16.

On September 1, 2016, Petitioner filed a second Petition for Writ of Habeas Corpus in the California Supreme Court, arguing that: (1) the prosecutor knowingly and intentionally withheld exculpatory evidence of a digital recording of the initial interview with witness Devon Michael Clements and (2) the California Court of Appeal failed to hold an evidentiary hearing on the prosecution's alleged withholding of exculpatory evidence. Lodgment 17. On November 9, 2016, the California Supreme Court denied the petition without a statement of reasoning or citation to authority. Lodgment 18.

Petitioner filed the instant Petition for Writ of Habeas Corpus on February 1, 2017. Pet.

## **SCOPE OF REVIEW**

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a) (2006 & Supp. 2016).

The Petition was filed after enactment of the Anti-terrorism and Effective Death Penalty

Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214.  Under 28 U.S.C. § 2254(d), as amended by AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In making this determination, a court may consider a lower court's analysis. Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991) (authorizing a reviewing court to look through to the last reasoned state court decision).  Summary denials are presumed to constitute adjudications on the merits unless "there is reason to think some other explanation for the state court's decision is more likely." Harrington v. Richter, 562 U.S. 86, 99-100 (2011).

A state court's decision is "'contrary to" clearly established federal law if the state court: (1) "applies a rule that contradicts the governing law set forth in [Supreme Court] cases"; or (2) "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., concurring).

A state court's decision is an "unreasonable application" of clearly established federal law where the state court "'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413).  "[A] federal habeas court may not issue [a] writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or

8

incorrectly. Rather, that application must be objectively unreasonable." Id. at 75-76 (citations and internal quotation marks omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.

If the state court provided no explanation of its reasoning, "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." Harrington, 562 U.S. at 102. In other words, a federal court may not grant habeas relief if any fairminded jurist could find the state court's ruling consistent with relevant Supreme Court precedent. Id.

Habeas relief also is available if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2) (West 2012); Wood v. Allen, 558 U.S. 290, 293 (2010). A state court's decision will not be overturned on factual grounds unless this Court finds that the state court's factual determinations were objectively unreasonable in light of the evidence presented in state court. See Miller-El, 537 U.S. at 340; see also Rice v. Collins, 546 U.S. 333, 341-42 (2006) (the fact that "[r]easonable minds reviewing the record might disagree" does not render a decision objectively unreasonable). This Court will presume that the state court's factual findings are correct, and Petitioner may overcome that presumption only by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); Schriro v. Landrigan, 550 U.S. 465, 473-74 (2007).

## **DISCUSSION**

Petitioner presents five grounds for relief. First, Petitioner claims the prosecution knowingly and intentionally withheld exculpatory evidence – a digital recording of statements made by witness Devon Michael Clements. Pet. at 6. Second, Petitioner alleges the California Court of Appeal erred by not holding an evidentiary hearing on the prosecution's alleged

withholding of evidence. Id. at 7. Third, Petitioner argues his Faretta rights were violated when the San Diego County Jail ("Jail") made decisional and statutory law available via a "kiosk" separate from the desktop with a word processer and denied him access to confidential legal phone calls and black ink pens. Id. at 8. Fourth, Petitioner asserts that the Jail's desktop computer obstructed his ability to properly review audio and video discovery produced by the prosecution, the office of assigned counsel failed to properly serve his legal documents, and Jail officials refused to provide Petitioner with sufficient copies to serve legal documents by mail. Id. at 9. Fifth, Petitioner claims the trial court erred by denying his motion for acquittal under section 1118.1 because there was insufficient evidence to find Petitioner did not act in self-defense. Id. at 10.

**A.    The Prosecution's Alleged Withholding or Destruction of Exculpatory Evidence**

Petitioner alleges that the prosecution knowingly and intentionally withheld a digital recording of an interview conducted by San Diego Police Detective Christopher Tews of witness Devon Michael Clements at the Peachtree Inn Residential Hotel on June 21, 2013. Id. at 6. Petitioner further alleges that the prosecution later presented false testimony from Detective Tews that a digital recording of the interview with Mr. Clements does not exist. Id. In support, Petitioner claims that Mr. Clements acknowledged the existence of the recorded interview at the preliminary hearing held on October 8, 2013, and that Detective Tews' incident report referenced the recorded interview. Id.

Respondent contends that Petitioner received one recording of the interview between Detective Tews and Mr. Clements from a different date and that there is not a second recording. Answer at 16. Accordingly, Respondent asserts that the prosecution neither withheld exculpatory evidence nor destroyed it. Id. In his Supplemental Traverse, Petitioner concedes that he received a copy of a recorded interview from a different date, but clarifies that he never received a copy of the June 21, 2013 interview. Supp. Traverse at 12-13, 15. Petitioner also admits that he received a copy of Detective Tews' report summarizing his June 21, 2013 interview of Mr. Clements. See ECF No. 16 at 15-21; see also Lodgment 1-8 at 902-08

1  (referencing the report).

2       Petitioner presented his claim to the California Court of Appeal and the California Supreme

3  Court in a Petition for Writ of Habeas Corpus.  Lodgments 13, 17.  The Court of Appeal denied

4  the claim in a reasoned opinion.  Lodgment 14.  The California Supreme Court denied the claim

5  without a statement of reasoning or citation to authority.  Lodgment 18.  The Court will therefore

6  look through the silent denial by the state supreme court to the appellate court opinion.  <u>Ylst</u>,

7  501 U.S. at 804.  In denying the claim, the appellate court stated the following:

8       In his writ petition, [Petitioner] claims that the prosecution failed to produce
9  exculpatory evidence or, alternatively, destroyed it before trial.  [Petitioner]
10  contends the police recorded an interview with an eyewitness to the assault, but
   denied the existence of the recording when [Petitioner] requested a copy before
11  trial.  He suggests the prosecution is either hiding the recording or destroyed it to
12  prevent having to disclose it.  He alleges that he asked his appellate counsel to
   raise this issue on direct appeal, but counsel refused to do so.
13

14       The prosecution has a duty to disclose evidence to a criminal defendant
   when the evidence is both favorable to the defendant and material on either guilt
15  or punishment.  (<u>In re Miranda</u> (2008) 43 Cal.4th 541, 575.)  Evidence is material
16  if there is a reasonable possibility that, had it been disclosed to the defense, the
   result of the trial would have been different. (<u>Ibid.</u>)  "Such a probability exists
17  when the undisclosed evidence reasonably could be taken to put the whole case
18  in such a different light as to undermine confidence in the verdict." (<u>Ibid.</u>)

19

20       [Petitioner] provides no explanation for the materiality of the alleged
   recording.  He was provided with notes from the interview and it appears both the
21  interviewing officer and the eyewitness testified at trial.  His claim that the
22  recording may have included additional or contradictory information is entirely
23  speculative and [Petitioner] fails to demonstrate the materiality of the alleged
   undisclosed information.
24

25       To the extent [Petitioner] is claiming that the police or prosecution
26  destroyed the exculpatory evidence contained in the recording, he makes no
   allegation or showing of bad faith.  Thus, [Petitioner] must demonstrate the
27

28                             11

materiality of the allegedly destroyed evidence. (See, e.g., <u>People v. Alvarez</u> (2014) 229 Cal.App.4th 761, 771-773.) As discussed above, [Petitioner] makes no such showing.

Lodgment 14 at 1-2.

## 1. Withholding of Evidence

Petitioner is not entitled to federal habeas relief for his claim that his constitutional rights were violated when the prosecution failed to provide an audio recording of the June 21, 2013 interview of Mr. Clements. The United States Supreme Court has held that the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985). To prevail on a <u>Brady</u> claim, a petitioner must show that: (1) the evidence was favorable to the accused either because it was exculpatory or impeaching; (2) the evidence was suppressed by the State; and (3) the suppression resulted in prejudice. <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999). In determining prejudice, the question is "whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Id.</u> at 290 (quoting <u>Kyles v. Whitley</u>, 514 U.S. 419, 435 (1995).

Here, the appellate court determined that the first and third elements had not been met, and as a result, declined to analyze whether the second element was met. <u>See</u> Lodgment 14. In concluding the alleged evidence was not prejudicial to Petitioner, the appellate court determined that Petitioner failed to establish the materiality of the alleged recording. <u>Id.</u> at 1. The appellate court noted that Petitioner was provided with notes from the interview and both the interviewing officer and witness testified at trial. <u>Id.</u> at 1-2. The appellate court concluded

that Petitioner's claim that the alleged recording might have included additional or contradictory information is "entirely speculative." Id. at 2. There is substantial evidence in the record supporting the appellate court's conclusion.

First, Petitioner makes no showing that the alleged recording was favorable to him. Petitioner does not allege that Mr. Clements' interview from June 21, 2013 contains any exculpatory or impeaching information. See Pet. at 6; see also Supp. Traverse at 11-19. Petitioner merely explains that Detective Tews indicated in his investigative report that he recorded an interview with Mr. Clements on the night of the incident, June 21, 2013, but later testified that he did not record the interview. Supp. Traverse at 14-16. This is supported by the record. Detective Tews testified that he interviewed Mr. Clements on June 21, 2013, but that he did not record the interview. Lodgment 1-8 at 900-01. Detective Tews explained that he errantly wrote that the interview was recorded in his investigative report. Id. at 901; see ECF No. 16 at 16 (Detective Tews' ivestigative report, which states "I went to the office and interviewed Clements. I recorded the conversation using my digital voice recorder."). Detective Tews testified that he recorded a subsequent interview he conducted with Mr. Clements. Lodgment 1-8 at 901. During cross-examination, Mr. Clements indicated that "to [his] knowledge" Detective Tews recorded his June 21, 2013 interview, but did not know for certain. Lodgment 1-7 at 770-71.

Further, Mr. Clements' trial testimony was consistent with the information provided by Mr. Clements in the June 21, 2013 interview as set forth in the written report prepared by Detective Tews and provided to Petitioner before trial. See Lodgments 1-7 at 718-71; 1-8 at 902-21, 923-24, 973-94, and 1008; 1-9 at 1130-32 and 1195-97; see also ECF 16 at 19. Detective Tew's Investigator's Report from June 21, 2013 describes the interview of Mr. Clements. ECF No. 16 at 19. It states that:

> Clements told me essentially the following: Is this gonna be played in court? I do not want that to happen because I feel my life is in danger. I got woken up by my friend Casey and was told that [Mr. Morao] was outside my door. [Mr.

Morao] was angry and pissed.  [Mr. Morao] would not tell me what was going on so I just followed him.  [Mr. Morao] and the guy had a problem.  The guy's name was Brian[, the Petitioner].  I was waiting here out front.  [Mr. Morao] and [Petitioner] went and fought by the tuxedo shop.  I thought they were boxing each other and had no idea he had a knife.  I never saw a knife.  The fight lasted one minute.  [Mr. Morao] came back to me and shook my hand.  [Mr. Morao] said I got him.  I have no idea what the fight was about.  After that [Mr. Morao] realized he was bleeding.  We went to the lobby.  I got paper towels to plug him up.

There is no ongoing beef between them that I know of.  I have known [Petitioner] for two months.  I do not know if they are involved in any illegal activity.  I do not know if they drank or did drugs together.  I know where [Petitioner's] room was.  I have not had anything to drink tonight.  I have not used any drugs.  I took my Seroquel medication.

[Petitioner] told me I was a dead man when [Mr. Morao] and I walked away.  I watched the fight from about twenty feet away.  It was a good distance like sixty feet.  It could have been half a block away.  They just fought and threw punches.  They yelled at each other.  I do not know what they were saying.  [Petitioner] said, "c'mon' but I do not really remember.  I don't know what this fight was over.  They were both heated and [Petitioner] provoked it all.  I did ask [Mr. Morao] what was going on and he did not answer me.  [Mr. Morao] did not appear to be drinking or using drugs.  I have seen [Petitioner] angry and blow things out of proportion.  [Petitioner] always thinks someone is after him and I think he uses drugs.  [Petitioner] has freaked out on people.  One time [Petitioner] thought I took his cell phone and that it was captured on camera.

Id.  During trial, Mr. Clements testified that on June 21, 2013, Mr. Morao came by his room at the Peachtree Inn in an agitated and angry state.  Lodgment 1-7 at 736-37.  Mr. Clements then followed Mr. Morao outside and observed Petitioner and Mr. Morao argue as they walked down the street.  Id. at 689-92, 741.  Mr. Clements followed the two at a distance and observed the two fighting.  Id. at 692-96, 759-60, 767.  Mr. Clements testified that he saw Petitioner strike Mr. Morao with something cylindrical that was about a foot and a half long with a sharp point at the end.  Id. at 696-98, 763-65, 797-98.  After the fight, Mr. Morao and Mr. Clements gave each

other celebratory hand gestures, or "daps." Id. at 704, 767. Only after giving each other "daps" did Mr. Morao realize he was bleeding. Id. at 707-08. Mr. Clements testified that Mr. Morao was bleeding from the lower torso area and Mr. Clements used napkins to try to stop the bleeding. Id. at 708-09, 759-60. He also testified that he truthfully told Detective Tews about the incident on June 21, 2013. Id. at 701.

Mr. Clements' testimony at trial and Detective Tews' June 21, 2013 Investigator's Report are consistent and, therefore, the information is not impeaching. See United States v. Johnson, 403 Fed. App'x 146, 149 (9th Cir. 2010) (finding that the allegedly withheld evidence was not impeaching because the redacted testimony was consistent with evidence produced at trial). The consistency also undercuts any argument that the digital recording might have contained information not set forth in Detective Tews' written report. Further, Mr. Clements' interview statements from June 21, 2013 were not exculpatory because they do not suggest that Petitioner was not guilty or less guilty. See Morris v. Ylst, 447 F.3d 735, 740 (9th Cir. 2006) (stating that suppressed evidence is not exculpatory if the evidence fails to show that "the [defendant is] *not* guilty, or that he [is] any *less* guilty") (emphasis in original). Accordingly, Petitioner has failed to show that the alleged audio recording from June 21, 2013 contained any exculpatory or impeaching evidence favorable to him. See Pitts v. Woodford, 2009 WL 2984159, at *15 (C.D. Cal. Aug. 31, 2009) (finding no Brady violation where the petitioner made no showing that a police interview tape contained information favorable to the petitioner); Brock v. Lea, 2011 WL 7277422, at *13-14 (C.D. Cal. Sept. 9, 2011) (finding no Brady violation where the petitioner alleged a police officer falsely testified she did not record an interview of the victim and the alleged recording was withheld by the prosecution because the testimony the victim gave and the testimony the officer gave at trial were consistent). Petitioner also has failed to show that the alleged recording contained any information not contained in Detective Tews' written report.

Second, the record supports a finding that the prosecution did not suppress an audio recording of the interview between Detective Tews and Mr. Clements on June 21, 2013. On December 10, 2013, Petitioner told the trial court that the prosecution provided him with a media

disc and thumb drive with video recordings and audio recordings, but that Petitioner could not play them on the Jail's equipment and the Office of Assigned Counsel also could not get the disc and thumb drive to work. Lodgment 1-3 at 251-52. The trial court ordered the prosecution to bring a laptop, the media disc, and the thumb drive to court the following day to allow Petitioner to view the evidence. Id. at 259-61. On December 11, 2013, the trial court provided Petitioner time to review the media disc and thumb drive on the prosecution-provided laptop and indicated they would regroup the next day to discuss any issues regarding the media. Id. at 268-69. On December 12, 2013, Petitioner informed the court that the "separate" recording of the Clements interview was not on the media disc or thumb drive. Id. at 274. The prosecution explained that there is only one recording of Mr. Clements and that the prosecution provided that recording to Petitioner. Id. at 274-75. On December 13, 2013, Petitioner told the trial court that "there is a report that specifically states that there was a recording made of an interview of Devon Clements . . . . However, you know, the prosecution now would contend that the officer said there was no recording. However, in his report, it states he recorded." Lodgment 1-4 at 408. The prosecution responded that "the detective t[old him] he recorded Devon Clements one time. Devon Clements tells me he was recorded one time. The recording of that conversation, [Petitioner] has had." Id. Petitioner asserted that there are three recordings. Id. The trial court advised Petitioner to recheck his data because the word "recorded" could refer to notes and not audio recordings. Id. at 409.

On December 17, 2013, the prosecution reiterated to Petitioner and the trial court that there is only one audio recording involving Mr. Clements and Detective Tews. Lodgment 1-5 at 471, 473. The prosecution then provided Petitioner with newly obtained handwritten notes taken by Detective Tews that were incorporated into his report. Id. at 471-72. Petitioner again voiced his objection, stating that there were additional audio recordings between Detective Tews and Mr. Clements. Id. at 473-74. The trial court concluded:

> All right. So here's the issue, then. Mr. – the – officer Tews says he only recorded him once. You believe that's incorrect. And according to you, you saw

notes where Mr. Clements said he spoke to him twice and was recorded twice. That is, again, something you will have to do through cross-examination of both of them, Tews and Clements, because he's denying it. So you'll have to cross-examine to find out what the differences were. And they're saying there's not a second tape. So that's only through cross-exam.

[The prosecutor] said he specifically asked him the question and Tews denied it. So at that point, he's stuck. You'll have to cross-examine on that issue through Clements and through Tews.

Id. at 474. The prosecutor and Detective Tews both stated on the record that there is no recording of the June 21, 2013 interview of Mr. Clements and Petitioner has not provided evidence countering their statements. Lodgments 1-8 at 900-01; 1-3 at 274-75; 1-5 at 471-73; see Pet.; see also Supp. Traverse. Further, Petitioner had Detective Tews' Investigator's Report from June 21, 2013, which included a summary of the statement provided by Mr. Clements. ECF No. 16 at 15-21. Petitioner had this report during trial and asked whether the information contained in the report was truthful. See Lodgment 1-8 at 902-08 (referencing Detective Tews' June 21, 2013 report). Detective Tews testified that the information in his report was accurate. Id. at 902. As discussed previously, Detective Tews' report and Mr. Clements testimony are consistent. As a result, there is no evidence to support Petitioner's claims that the tape existed and that the government suppressed it other than the single sentence in Detective Tews' report which he admitted was false.

Third, even if the interview between Mr. Clements and Detective Tews had been digitally recorded, Petitioner must show that the prosecution's failure to produce the recording "was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." Strickler, 527 U.S. at 281. Petitioner does not satisfy this standard. Petitioner offers no explanation about what statements the June 21, 2013 interview contained that would have created a reasonable probability of a different verdict. United States v. Agurs, 427 U.S. 97, 109-10 (1976) ("The mere possibility that . . . undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish

'materiality' in the constitutional sense."); <u>Crawford v. Head</u>, 311 F.3d 1288, 1329 (11th Cir. 2002) (this court "cannot consider conjecture" about what evidence "might have shown" in deciding a <u>Brady</u> claim). Rather, the record indicates that any recording of Mr. Clements' interview would be consistent with Detective Tews' written report and the testimony of both Detective Tews and Mr. Clements.

Accordingly, the Court of Appeal's conclusion that Petitioner had not established that the prosecution withheld exculpatory or impeaching evidence is not contrary to or an unreasonable application of clearly established Federal law.

### 2. Destruction of Evidence

Petitioner also contends that the alleged June 21, 2013 recording was inappropriately destroyed. Pet. at 6; Supp. Traverse at 11. Petitioner argues that, based on Detective Tews' report referencing a digital recording and Mr. Clements' testimony that he thought the June 21, 2013 interview was recorded, the prosecution and/or Detective Tews "eliminated" the audio recording. Pet. at 6; Supp. Traverse at 11-12. Petitioner also alleges that, to cover up the existence of the recording, Detective Tews' provided false testimony at trial explaining there is no audio recording. Pet. at 6; Supp. Traverse at 15.

The Supreme Court has held that where the government fails to preserve evidence that is only potentially exculpatory, the right to due process is violated only if it possesses "an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." <u>California v. Trombetta</u>, 467 U.S. 479, 489 (1984). The Supreme Court has also held that the defendant must also demonstrate the government's bad faith in failing to preserve the potentially useful evidence. <u>Arizona v. Youngblood</u>, 488 U.S. 51, 58 (1988); <u>see United States v. Booth</u>, 309 F.3d 566, 574 (9th Cir. 2002).

Detective Tews testified that he did not record the interview with Mr. Clements on June 21, 2013. Lodgment 1-8 at 900-01. However, Detective Tews did take four pages of handwritten notes on the interview and also prepared an investigative report summarizing the

interview – both of which were provided to Petitioner.  Lodgment 1-5 at 471-72; ECF No. 16 at 19.  Additionally, Detective Tews and Mr. Clements testified and were subject to Petitioner's cross-examination at trial.  See Lodgments 1-7 at 687-805; 1-8 at 889-1012; 1-9 at 1130-45; 1193-97.  Petitioner's mere speculation that there was a recording, that it was destroyed, and that it contained relevant additional information not reflected in the notes, report, or testimony of Mr. Clements and Detective Tews is insufficient to carry his burden of showing that the California Court of Appeal and California Supreme Court could not reasonably have found such a recording did not possess exculpatory value that was apparent at the time it was allegedly destroyed.  See Brock, 2011 WL 7277422, at *14-15 (C.D. Cal. Sept. 9, 2011).  Moreover, Petitioner has failed to show that there was a recording to begin with.  Petitioner also has failed to show that Detective Tews or the prosecution acted in bad faith by destroying the audio recording of the interview with Mr. Clements where the substance of the interview was recorded in Detective Tews' investigative report and contained in four pages of handwritten notes.  See e.g., Villafuerte v. Stewart, 111 F.3d 616, 625 (9th Cir. 1997) ("a negligent investigation does not violate [defendant's] due process rights"), cert denied, 522 U.S. 1079 (1998).

Thus, the Court of Appeal's decision that Petitioner did not establish that the prosecution or police destroyed evidence was not contrary to or an unreasonable application of clearly established Federal law.

### 3.    Conclusion

Petitioner has not established that there was an audio recording of Mr. Clements' June 21, 2013 interview, that the government suppressed or destroyed the recording, and that the recording contained favorable information, not present in Detective Tews' handwritten notes or written report, that would have changed the outcome of the trial.  Therefore, the Court finds that the California Court of Appeal and California Supreme Court's decisions were not contrary to or an unreasonable application of clearly established Federal law and **RECOMMENDS** that Petitioner's first ground for relief be **DENIED**.

//

**B.** **California Court of Appeal's Failure to Hold an Evidentiary Hearing**

In his second claim, Petitioner alleges the California Court of Appeal erred by failing to hold an evidentiary hearing in his post-conviction proceedings on the prosecution's alleged withholding of evidence. Pet. at 7. In support, Petitioner opines that the Court of Appeal is "incapable of making a determination [of whether the recording is exculpatory evidence] without itself reviewing the recording." Id. Respondent contends that AEDPA does not require states to conduct evidentiary hearings, and therefore, Petitioner's second claim should be denied. Answer at 21-22.

Petitioner's claim is not cognizable in this federal habeas petition. "A postconviction proceeding is not part of the criminal process itself, but is instead a civil action designed to overturn a presumptively valid criminal judgment. Nothing in the Constitution requires the States to provide [an evidentiary hearing.]" Murray v. Giarratano, 492 U.S. 1, 13 (1989) (O'Connor, J., concurring). Thus, complaints about asserted errors in the state post-conviction process may not be considered on federal habeas review. See e.g., Franzen v. Brinkman, 877 F.2d 26, 26 (9th Cir. 1989) (per curiam) ("a petition alleging errors in the state post-conviction review process is not addressable through habeas corpus proceedings"); see also Ortiz v. Stewart, 149 F.3d 923, 939 (9th Cir. 1998) ("federal habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings"); Gerlaugh v. Stewart, 129 F.3d 1027, 1045 (9th Cir. 1997) (errors committed during state post-conviction proceedings are not cognizable in a federal habeas action); Villafuerte, 111 F.3d at 632 n.7 (claim that petitioner "was denied due process in his state habeas corpus proceedings" was not cognizable on federal habeas review). Accordingly, the Court **RECOMMENDS** that Petitioner's Petition be **DENIED** on this ground. See Gentry v. Sinclair, 576 F. Supp. 2d 1130, 1170 (W.D. Wash. Sept. 15, 2008) (finding the petitioner's claim that the state court's failure to hold an evidentiary hearing during the post-conviction proceedings not cognizable on federal habeas review).

**C.** **Petitioner's Faretta Rights Violations**

In his third and fourth claims, Petitioner alleges that the Jail's policies violated Petitioner's

Faretta rights.  Pet. at 8-9.  In his third claim, Petitioner alleges that the Jail denied him access to confidential legal phone calls necessary for trial preparation, and black ink pens to comply with the rules of the court. [2]  Id.  Respondent contends that issues in the Jail concerning the monitoring of telephone calls and the issuance of pencils rather than pens are not a basis for finding a constitutional violation.  Answer at 22.

In Petitioner's fourth claim, he alleges that the Jail failed to provide a desktop computer with a word processor and legal reference capabilities, that the Jail's desktop computer system was incapable of showing audio and video evidence produced by the prosecution, that the Office of Assigned Counsel failed to properly serve legal documents upon the prosecution, and that jail officials refused to provide Petitioner with sufficient copies of legal documents to serve the prosecution by mail.  Pet. at 8-9.  Petitioner acknowledges that the Jail has a "kiosk" with legal reference capabilities, but alleges that it is separate from the desktop with word processing software on it, which makes copying legal research and pasting it into a word processing document impossible.  Id.  Respondent contends there is not United States Supreme Court precedent requiring jails to provide kiosks linked to a computer with a word processor and legal reference materials, nor is there a constitutional violation when a county jail computer cannot read a thumb drive.  Answer at 23.  Respondent also asserts there is no constitutional violation where jail personnel failed to make sufficient copies of motions for service by mail where the petitioner had the services of a runner.  Id.  In his Supplemental Traverse, Petitioner counters that Supreme Court precedent requires prisoners to have an adequate law library and that the legal reference kiosk being separate from the word processor desktop is inadequate.  Supp. Traverse at 31.

Petitioner presented these claims to the California Court of Appeal and the California Supreme Court.  See Lodgments 11, 15.  The Court of Appeal did not address the merits and

---

[2] Petitioner also alleges that the Jail's "kiosk" for legal research being separate from the desktop with a word processing program violated his rights.  Pet. at 9.  The Court addresses this claim under his fourth ground for relief and will not address the claim under his third ground for relief.

17cv209-AJB (BLM)

denied the claim as being untimely. Lodgment 12. The California Supreme Court denied the claim without a statement of reasoning or citation to authority. Lodgment 16. Respondent did not assert an affirmative defense that this claim is procedurally defaulted because it is untimely. See Answer. Absent extraordinary circumstances, a procedural default argument is waived by failing to raise it. Brown v. Maass, 11 F.3d 914, 914-15 (9th Cir. 1993); Franklin v. Johnson, 290 F.3d 1223, 1231, 1232-33 (9th Cir. 2002) (in post-AEDPA cases, a state waives a procedural bar argument by failing to raise it in the first responsive pleading); Morrison v. Mahoney, 399 F.3d 1042, 1046-47 (9th Cir. 2005) (holding that "the defense of procedural default should be raised in the first responsive pleading in order to avoid waiver").

Under AEDPA, federal courts apply a "'highly deferential standard for evaluating state-court rulings,' which demands that state-court decisions be given the benefit of the doubt." Woodford v. Viscotti, 537 U.S. 19, 24 (2002) (per curiam). However, "when it is clear that a state court has not reached the merits of a properly raised issue, we must review it de novo." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002) (citation omitted). Accordingly, this Court will review Petitioner's Faretta claims de novo. See Yates v. Ryan, 2008 WL 2757285, at *2 (N.D. Cal. July 14, 2008) (stating that where a respondent fails to raise the issue of a procedural bar in its answer and instead addressed the merits of a petitioner's claims, the court reviews the merits of the claims).

In Faretta v. California, the Supreme Court held that, "[a]lthough not stated in the [Sixth] Amendment in so many words, the right to self-representation – to make one's own defense personally – is . . . necessarily implied by the structure of the Amendment." Faretta v. California, 422 U.S. 806, 819 (1975). This right contemplates a defendant's active and meaningful participation in the trial:

> A defendant's right to self-representation plainly encompasses certain specific rights to have his voice heard. The *pro se* defendant must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in *voir dire*, to question witnesses, and to address the court and the jury at appropriate points in the trial.

McKaskle v. Wiggins, 465 U.S. 168, 174 (1984).  The Ninth Circuit has held that "time to prepare and some access to materials and witnesses are fundamental to a meaningful right of representation," and that "[a]n incarcerated defendant may not meaningfully exercise his right to represent himself without access to law books, witnesses, or other tools to prepare a defense." Milton v. Morris, 767 F.2d 1443, 1446 (9th Cir. 1985) (citing Faretta, 422 U.S. at 818; see also United States v. Sarno, 73 F.3d 1470, 1491 (9th Cir. 1995) ("[T]he Sixth Amendment demands that a *pro se* defendant who is incarcerated be afforded reasonable access to 'law books, witnesses, or other tools to prepare a defense.'"  (quoting Milton, 767 F.2d at 1446)).  "The right of access is not unlimited, but must be balanced against the legitimate security needs or resource constraints of the prison."  Sarno, 73 F.3d at 1491 (citing United States v. Robinson, 913 F.2d 712, 717 (9th Cir. 1990) *cert. denied*, 498 U.S. 1104 (1991); Lindquist v. Idaho State Bd. Of Corrections, 776 F.2d 851, 858 (9th Cir. 1985); Milton, 767 F.2d at 1446-47).  However, the Supreme Court has observed that "Faretta says nothing about any specific legal aid that the State owes a *pro se* criminal defendant," such as access to adequate *pro se* resources.  Kane v. Garcia Espitia, 546 U.S. 9, 10 (2005) (per curiam).

In the absence of clearly established federal law on the issue of specific legal resources constitutionally required for a *pro se* criminal defendant, Petitioner is not entitled to federal habeas relief on this claim.  See Kane, 546 U.S. at 10 (claimed violation of law library access right for self-represented criminal defendant could not afford basis for federal habeas relief). Because "[t]he Supreme Court has never established a clear Sixth Amendment right of access to legal materials for pro se defendants," the appellate courts' rejection of Petitioner's claim was not contrary to, or an objectively unreasonable application of, any clearly established federal law as determined by the United States Supreme Court.  Reed v. Schriro, 290 Fed. App'x 982, 984 (9th Cir. 2008); see also Thomas v. Muniz, 2016 WL 4191276, at *12 (C.D. Cal. Jan. 22, 2016) (finding that the Supreme Court has never established a clear Sixth Amendment right of access to legal materials for criminal defendants representing themselves); Lathan v. Felker, 2010 WL 958947, at *12 (C.D. Cal. Jan. 21, 2010) ("Because no clearly established Supreme

23

Court law requires the state to supply a *pro se* criminal defendant with books and tools assertedly needed to present a defense, Petitioner is not entitled to habeas relief on his <u>Faretta</u> claim."); <u>Ringo v. Marshall</u>, 2010 WL 1444688, at *13 (C.D. Cal. Feb. 23, 2010) (denying federal habeas relief where the petitioner alleged he did not have access to a law library while representing himself because the Supreme Court has never established that a *pro se* defendant has right of access to legal materials).

Further, Petitioner does not establish any specific injury or prejudice arising out of allegedly deficient legal resources and the record in this case reflects that the trial court adequately addressed the issues raised by Petitioner. <u>See</u> Pet.; <u>see</u> <u>also</u> Supp. Traverse. For example, on November 21, 2013, Petitioner complained that he could not comply with the rules of court requiring handwritten motions to be in black ink because the Jail only provides inmates with "golf lead pencils." Lodgment 1-1 at 2. He also stated that using the golf pencils makes it difficult for him to even complete motions. <u>Id.</u> at 3. Petitioner explained that he filed a motion to compel discovery in pencil and because it was not in black ink, the prosecution never received it. <u>Id.</u> To remedy this error, the trial court permitted Petitioner to "outline what it is [he was] seeking in discovery" orally before the trial court. <u>Id.</u> The trial court further set a hearing date to determine whether Petitioner could have access to pens for the following week. <u>Id.</u> at 9 ("I'm going to ask the Sheriff's Department, or a Sheriff's Department representative, to be present to explain to the court why they can't provide pens or pen fillers.").

On November 26, 2013, Deputy Sheriff Rhonda Steffen testified that inmates at the Jail cannot have pens and pen fillers for safety reasons. <u>Id.</u> at 15. She explained that "they have been fashioned into syringes. They've also been fashioned into tattoo kits, and there were the spreading of infections that resulted. And once you do fashion these types of instruments, they become in demand. So they were being shared, which again speaks to the spreading of diseases." <u>Id.</u> Deputy Sheriff Steffen also stated that "it's the Sheriff's policy to use shorter pencils" because they are less likely to be used as a "stabbing instrument." <u>Id.</u> After hearing Deputy Sheriff Steffen's testimony, the trial court concluded:

17cv209-AJB (BLM)

So I do believe that pencils and pens are significantly different, that the pen has the ability to be fashioned into a syringe, has the ability to serve as a tattooing instrument by virtue of the fact that it can be used as a syringe, as articulated by the representative from the Sheriff. It can be something that's in demand. And because there are health concerns in the jail on a number of fronts with regard to disease that can be spread by the use of a syringe and the fact it can be spread around, the very fact that it can be used by one person who is ill and then used by a number of other people who are not ill who then become ill jeopardizes the entire health of the jail. So it seems rational to me.

Id. at 16-17. At that same hearing, Petitioner complained he did not have access to a working phone line to make legal calls. Id. at 24-25. Deputy Sheriff Steffen stated that "the Pro Per Deputy keeps logs of every phone call or how much phone usage [pro pers] have. If the phone wasn't serviceable, he would have made a notation of that. I spoke to the Deputy himself, and the only issues that he remembers [Petitioner] bringing up was the pencil sharpener, to which he provided him one." Id. at 26. The trial court ordered that Petitioner have access to whatever communication devices he needed to call the Office of Assigned Counsel by the end of business that day. Id.

On the same day, November 26, 2013, the trial court held a sealed *ex parte* hearing regarding Petitioner's "*Ex Parte* Notice of Obstruction of Faretta Rights." ECF No. 17 at 51. Petitioner clarified that he did not have access to pens, to a legal phone for confidential legal phone calls, and "a bunch of different things." Id. at 52. The trial court asked "so can I just file this in the file . . . . There's no action for - - you need me to take on this?" Id. Petitioner stated that the trial court could just place the notice in the file and that the purpose of the hearing was "just for notice." Id. Petitioner did not raise his concerns regarding the San Diego County Jail's "kiosk" for legal research being separate from a desktop with a word processor. See Lodgments 1-1, 1-2, 1-3, 1-4.

Moreover, Petitioner does not allege that the trial court would not hear his motions because they were written in pencil, because Jail officials would not provide sufficient copies for service and filing of documents, or because the Office of Assigned Counsel failed to properly

serve the motions.  See Pet.; see also Supp. Traverse.  In fact, the record reflects that the trial court heard several of Petitioner's motions orally whenever he alleged having issues filing or serving the motion or not being able to complete writing the motion because of the writing utensils he was given.  See Lodgments 1-1, 1-2, 1-3, 1-4.  Further, the trial court ordered Petitioner have access to telephones for legal phone calls.  Lodgment 1-1 at 26.  While Petitioner later asserted that he couldn't call his bank, the trial court informed him that calling the bank would not be the appropriate way to get information from them and advised him to get the information through the Office of Assigned Counsel.  Lodgment 1-3 at 262-63.  Additionally, Petitioner does not assert how the "kiosk" for legal research being separate from a desktop with a word processor injured or prejudiced him.  See Pet.; see also Supp. Traverse.  His Petition and Supplemental Traverse imply that the separation of the kiosk and desktop are mere inconveniences.  See Pet.; see also Supp. Traverse.  Finally, the trial court ensured that Petitioner could review discovery provided by the prosecution that did not work on the Jail's computer systems by permitting Petitioner to review the thumb drive and media disc on a prosecution provided laptop at the Courthouse.  Lodgment 1-3 at 251-74.  This negated any prejudice Petitioner might have endured by the Jail's computer system's inability to view the thumb drive and media disc.

In summation, under AEDPA, denial of a self-represented criminal defendant's access to legal materials cannot be a basis for relief.  Nevertheless, even if Petitioner's claim is governed by Ninth Circuit cases recognizing a *pro se* criminal defendant's Sixth Amendment right of access to legal resources, the Ninth Circuit has only held that such defendants may not be deprived of all means of researching and preparing a defense.  See Milton, 767 F.2d at 1446.  Some restriction on access to legal materials is permissible.  See Bribiesca v. Galaza, 215 F.3d 1015, 1020 (9th Cir. 2000) (acknowledging that restrictions on access to law library based on security concerns did not offend inmate's constitutional rights).  Here, as discussed in detail above, Petitioner was not deprived of all access to materials to put on his defense and he does not specify how his defense was hampered by the restrictions on his access to pens, confidential

legal phone calls, inadequate service runners, inadequate copies for service by mail, a computer system capable of viewing files on a thumb drive and media disc, or a desktop with both word processing programs and legal research capabilities. Accordingly, the Court **RECOMMENDS** that Petitioner's third and fourth grounds for relief be **DENIED**.

## D. <u>Failure to Grant Motion for Acquittal and Sufficiency of the Evidence</u>

In Petitioner's fifth and final claim, he alleges that the trial court erred by denying his motion under California Penal Code section 1118.1 for a judgment of acquittal. Pet. at 10. In support, Petitioner alleges there was insufficient evidence in the prosecution's case to support a finding that Petitioner did not act in self-defense. <u>Id.</u> Respondent contends there was sufficient evidence to convict Petitioner of assault and that Petitioner was not acting in self-defense. Answer at 25-26. Accordingly, Respondent asserts the trial court did not err by denying Petitioner's motion for acquittal. <u>Id.</u> In his Supplemental Traverse, Petitioner argues there was insufficient evidence that Petitioner stabbed Morao after he was disarmed. Supp. Traverse at 34-37. Therefore, Petitioner asserts that he was acting in self-defense and could not have been convicted of assault with a deadly weapon. <u>Id.</u> at 34-38.

Petitioner raised this claim on direct review before the California Court of Appeal and the California Supreme Court. Lodgments 5, 9. The California Court of Appeal affirmed the trial court's decision and the California Supreme Court denied the claim without a statement of reasoning or citation to authority. Lodgments 8, 10. The Court will therefore look through the silent denial by the state supreme court to the appellate court opinion. <u>Ylst</u>, 501 U.S. at 804. In denying the claim, the appellate court stated the following:

A. *Introduction*

[Petitioner] moved under section 1118.1 for entry of judgment of acquittal at the close of the prosecution's case. The trial court denied the motion, finding the prosecution met its burden of circumstantial and direct evidence, including evidence sufficient for the issue of self-defense to go to the jury. [Petitioner] contends the trial court erred, because the prosecution advanced insufficient

evidence to show [Petitioner] was not acting in self-defense.  We disagree.

B.  *Standard of Review*

    """The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, 'whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged.'" [Citation.]  "The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case."  [Citations.]  The question "is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination.'"" (<u>People v. Maciel</u> (2013) 57 Cal.4th 482, 522.)

    "'In reviewing a challenge to the sufficiency of the evidence, we do not determine the fact ourselves.  Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – evidence that is reasonable, credible and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.]  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (<u>People v. Houston</u> (2012) 54 Cal. 4th 1186, 1215.).

    "Notably, however, '[r]eview of the denial of a section 1118.1 motion made at the close of a prosecutor's case-in-chief focuses on the state of the evidence as it stood at that point.'"  (<u>People v. Hajek and Vo</u> (2014) 58 Cal. 4th 1144, 1183.).

C.  *Assault with a Deadly Weapon and Self-Defense*

    To convict on assault with a deadly weapon, the prosecution must prove "[t]he defendant did not act (in self-defense/ [or] in defense of someone else)." (CALCRIM No. 875.)  To determine whether self-defense applies, a trier of fact generally must determine "whether the circumstances would cause a reasonable person to perceive the necessity of defense, whether the defendant actually acted out of defense of himself, and whether the force used was excessive."  (<u>People v.</u>

Clark (1982) 23 Cal. 4th 82, 92.) "[A]ny right of self-defense is limited to the use of such force as is reasonable under the circumstances." (People v. Pinholster (1992) 1 Cal. 4th 865, 966, overruled on other grounds in People v. Williams (2010) 49 Cal. 4th 405, 459.) "[A]lthough the test is objective, reasonableness is determined from the point of view of a reasonable person in the defendant's position. The jury must consider all the facts and circumstances it might '"expect[] to operate on [defendant's] mind."'" (People v. Minifie (1996) 13 Cal.2d 673, 675.) Explained another way, in such cases "[t]he justification of self-defense requires a double showing: that defendant was actually in fear of his life or serious bodily injury and that the conduct of the other party was such as to produce the state of mind in a reasonable person." (People v. Sonier (1952) 113 Cal.App.2d 277, 278.)

[Petitioner] asserts the prosecution failed to prove its case because a defendant must be allowed to use a weapon other than fists if his own fists are "inadequate to the task" and he finds himself at risk of serious injury. However, the record does not establish [Petitioner] was at risk for serious injury during the fight with Morao. On appeal, [Petitioner] argues "fists can do tremendous damage" and inflict "great bodily injury," citing to boxing matches and pictures in assault cases, but fails to identify any evidence of Morao possessing such dangerous fists, or any particular fighting expertise. [Petitioner] further speculates it was possible Morao could have had a weapon other than the pool cue, because he was a drug user, dealer and criminal and many people now carry concealed guns. However, [Petitioner] points to no evidence to support any reasonable belief Morao was armed after [Petitioner] took the pool cue or [Petitioner] was otherwise under threat of death or great bodily harm. [Notably, [Petitioner] did not present any evidence at trial as to his state of mind during the fight to support a self-defense theory. Under [Petitioner's] theory of the case, he took the pool cue from Morao, Morao ran from him and was stabbed by someone else.]

Under these circumstances, the court properly determined that the prosecutor presented sufficient evidence to negate [Petitioner's] self-defense claim. The evidence viewed most favorably to the prosecution establishes [Petitioner] used unreasonable force in the fight between two friends, defeating his claim of lawful self-defense. Earlier in the day, [Petitioner] had hit another man hard enough to knock him down. Although Morao swung at [Petitioner] with part of a pool cue, [Petitioner] disarmed Morao before being struck. Morao was

able to get in a number of punches after being disarmed, but [Petitioner] was taller and had better reach. Morao felt threatened by the size disparity due to [Petitioner's] advantage of height and "reach." Morao, the smaller man, appeared intimidated by [Petitioner] at trial. The entire altercation lasted seconds to a minute, yet Morao suffered multiple stab wounds, including an abdominal wound that left him hospitalized for a week. [Petitioner] admitted to being in possession of a foot-long knife with a serrated blade.

On this record, there was substantial evidence for a reasonable trier of fact to conclude that [Petitioner] used excessive force in stabbing a disarmed Morao, overcoming any claim of lawful self-defense. The trial court did not err in denying acquittal.

Lodgment 8 at 7-11.

Pursuant to California Penal Code Section 1118.1, a criminal defendant in California who believes that the prosecution has failed to meet its burden of proof can move for acquittal at any point after the close of the prosecution's case in chief, provided that the motion is made before the case is submitted to the jury. Cal. Penal Code § 1118.1. "In ruling on a motion for judgment of acquittal pursuant to section 1118.1, a trial court applies the same standard an appellate court applies in reviewing the sufficiency of the evidence." People v. Cole, 33 Cal.4th 1158, 1212-13 (2004). "The question 'is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination.'" People v. Stevens, 41 Cal.4th 182, 200 (2007) (citations omitted). When reviewing the denial of a section 1118.1 motion, the reviewing court considers only the evidence in the record at the time the motion was made. Id.

Petitioner's Section 1118.1 claim is not cognizable in this proceeding. Petitioner's contention that, under California law, he should have been granted relief under Section 1118.1 presents no federal habeas issue and implicates state law only. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Bonin v. Calderon, 77 F.3d 1155, 1161 (9th Cir. 1996). Even if this claim were cognizable, it would still fail. Petitioner has identified no clearly established federal right to an acquittal, let alone on the legal standard articulated in Section 1118.1. See Wright v. Van Patten, 552 U.S. 120, 125-26 (2008); see also Moses v. Payne, 555 F.3d 742, 754 (2009) (where no

17cv209-AJB (BLM)

decision of the Supreme Court squarely addresses an issue, the state court's adjudication cannot be contrary to, or an unreasonable application of, Supreme Court law).  The only clearly established federal right identified by Petitioner in this claim is the right to a conviction based upon constitutionally sufficient evidence.  Pet. at 10.  The court will address the sufficiency of the evidence in the event that Petitioner intended to raise sufficiency of the evidence instead of the trial court's error in denying his motion for acquittal under Section 1118.1.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  The Fourteenth Amendment's Due Process Clause is violated, and an applicant is entitled to federal habeas corpus relief, "if it is found that upon the record evidence adduced at trial no rational trier of fact could have found guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979).  The Court must apply an additional layer of deference to the state appellate court opinion in applying the Jackson standard.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  Federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice systems," and not simply as a means of error correction.  Harrington, 562 U.S. at 102-03 (quoting Jackson, 443 U.S. at 332 n.5 (Stevens, J., concurring)).

Petitioner in essence challenges his conviction arguing the jury's finding—that he did not act in self-defense—was not supported by the evidence in violation of his constitutional right to due process.  Pet. at 10.  Review of the record in this case confirms that the Court of Appeal's decision was neither contrary to nor an unreasonable application of clearly established federal law.

To convict of assault with a deadly weapon, the prosecution must prove that Petitioner did not act in self-defense.  CALCRIM No. 875.  To determine whether Petitioner acted in self-defense the jury must determine "whether the circumstances would cause a reasonable person to believe the necessity of defense, whether the defendant actually acted out of defense of himself, and whether the force used was excessive." People v. Clark, 130 Cal. App. 3d 371,

17cv209-AJB (BLM)

378, *abrogated on other grounds by* People v. Blakeley, 23 Cal. 4th 82, 92 (2000). For self-defense to apply to an assault with a deadly weapon charge, the defendant must have shown that he was actually in fear of his life or serious bodily injury and that the other party's conduct was such as to produce that state of mind in a reasonable person. People v. Sonier, 113 Cal. App. 2d 277, 278 (1952).

Mr. Clements testified that at the time of the trial he had known Petitioner for about half a year and identified him as the defendant. Lodgment 1-7 at 687-88. Mr. Clements testified that he observed the fight between Petitioner and Mr. Morao on June 21, 2013. See id. at 687-805. He testified that he followed Petitioner and Mr. Morao at a distance as they walked down the street arguing. Id. at 689-92, 737-41. From a distance, Mr. Clements saw Petitioner strike Mr. Morao with something cylindrical with a sharp point. Id. at 696-98, 763-65, 797-98. Shortly after the fight, Mr. Clements noticed that Mr. Morao was bleeding. Id. at 708-09, 759-60. Mr. Clements testified that he thought "whatever was in [Petitioner's] hand did what happened to [Mr. Morao]." Id. at 797.

Mr. Morao also testified at the trial. Id. at 817-69; Lodgment 1-8 at 926-72. Mr. Morao testified that when he first spoke with Detective Tews the night of the incident, he said he was "jumped by – by two Hispanics." Lodgments 1-7 at 817; 1-8 at 927-28. Mr. Morao explained that he lied to Detective Tews initially because of his "felon mentality." Lodgment 1-7 at 819. However, when Detective Tews told Mr. Morao he had surveillance video of the incident, Mr. Morao told Detective Tews the truth. Id.

Mr. Morao testified that he and Petitioner fought on June 21, 2013 and that he was stabbed 14 times. Id. at 817-45, 850, 862. Specifically, he testified that he and Petitioner were arguing about money as they walked down the street and when Petitioner got close to Mr. Morao, the two began hitting each other. Id. at 839-40; Lodgment 1-8 at 937-42. Mr. Morao carried a pool cue with him because he knew Petitioner carried weapons and earlier in the day, Petitioner had shown him a serrated knife with a four or five inch blade. Lodgments 1-7 at 836-38; 1-8 at 930, 935. Mr. Morao testified that he tried to hit Petitioner with his pool cue, but

Petitioner disarmed him.  Lodgments 1-7 at 840; 1-7 at 948.  Mr. Morao then began punching Petitioner in the face and head.  Lodgments 1-7 at 840; 1-8 at 954  Mr. Morao testified that he wasn't paying much attention to what Petitioner was doing because "he's big" and Mr. Morao was just "doing [his] best to fight him."  Lodgment 1-7 at 841.  Mr. Morao testified that at the time of the fight he was 5'7" and weighed about 205 pounds and that Petitioner has an advantage over him because Petitioner is "way taller" and bigger than he is.  Id. at 834-41; Lodgment 1-8 at 944-45.  Mr. Morao testified that he felt "blows" to his chest and stomach, but didn't feel himself getting stabbed.  Lodgment 1-7 at 841-42.  After a while, Mr. Morao and Petitioner "just suddenly stopped" fighting because Mr. Morao felt like he "got enough hits in, and . . . just stopped."  Id. at 842.  Mr. Morao testified that after the fight he walked towards Mr. Clements and gave him celebratory high fives because Mr. Morao "felt like [he] got [Petitioner]."  Id. at 843-44.  At that point, Mr. Clements pointed out that Mr. Morao was bleeding.  Id. at 844.  Mr. Morao testified that his clothes were "drenched in blood."  Id. at 845.

Petitioner testified on his own behalf.  Lodgment 1-9 at 1145-93.  He testified that Mr. Morao would call him every few weeks to help him obtain methamphetamine.  Id. at 1145.  On June 21, 2013, Petitioner and Mr. Morao got into an argument about the price of methamphetamine and Mr. Morao told Petitioner to "come around the front."  Id. at 1149-50. Petitioner testified that he had a .25 caliber pistol and a "big ol' knife" on him at the time, but didn't want to use it because he thought this was a fist-to-fist fight.  Id. at 1151, 1156-57, 1161-62.  Petitioner testified that Mr. Morao wanted to fight and Petitioner thought "I ain't got no problem.  I'm fixing to whip this little chump's ass, you know, for crossing me up, plain and simple."  Id. at 1152.  He testified that he did not stab Mr. Morao and only used his hands.  Id. at 1153.  Petitioner testified that he wasn't worried about fighting Mr. Morao, who is twenty years younger, because "[m]ost youngsters these days they don't even know how to sling the fist.  They can't even fight."  Id. at 1154.  Petitioner testified that he suffered an injury to the nose as a result of Mr. Morao punching him in the face.  Id. at 1169.  He explained that once he took the pool cue away from Mr. Morao, Mr. Morao ran away and that was the end of the

fight.  Id. at 1154-55.  Petitioner testified that he went to the police station after the fight because Mr. Morao attacked him and Petitioner was just defending himself.  Id. at 1157.  On cross-examination, Petitioner testified that a Hispanic male stabbed Mr. Morao after he ran away from Petitioner.  Id. at 1158.  Later, Petitioner testified that he never actually went to the police department to report what happened on June 21, 2013.  Id. at 1165.

During the section 1118.1 hearing, Petitioner argued that the evidence was insufficient to prove he had not acted in self-defense.  Lodgment 1-8 at 1015.  He explained:

> There's no evidence – there has been no testimony to prove that the defendant has actually had a knife in his hand.
>
> There was testimony, however, that the defendant took from the alleged victim with both hands his club or his pool stick, weapon of choice.  There's conflicting testimony as to what he did with that.  However, the witness – based upon the presentation of the preliminary transcript to refresh the individual's memory, at first stated that he swung and he hit the defendant 20 times, you know.  And then on that he swung the stick first, and it didn't work.  The defendant took it away from him.  But he just kept swinging.
>
> However, we brought it out that – on cross-examination when he swung the stick, it was taken from him, and he ran into the streets.
>
> Okay.  Now, the video that was shown does not show the defendant do anything to [Mr. Morao].  [Mr. Morao] – all it shows is some feet work, and then it shows [Mr. Morao] running into the street.  It doesn't show the defendant chasing him.
>
> In fact, I obtained testimony from the alleged victim that he was getting loud in front of the Peachtree.  And he told the defendant, let's take it down the street.
>
> And he had concealed on his person a club which he intended to use on the defendant.  The defendant had no knowledge of this, and he didn't tell the defendant that he was going to do this.

17cv209-AJB (BLM)

But when he did do it, the defendant had an absolute right to defend himself. However, the defense is not saying that they used a knife on the alleged victim. The defense position is plain and simple. That he took the stick away from him, and he ran away and he run off in the street.

Based upon the – the – what he tried to do earlier resulting from the argument that was up in the room, somebody else did it to him that there – they – both [Mr. Clements] and [Mr. Morao] is more afraid of, but they feel like it would be easier for them to put it off on me because other people will take a machete and chop their head off.

Id. at 1015-16. The prosecution countered, arguing as follows:

Well, let me first address the apparent defense theory that Mr. Morao was not stabbed at the – outside the residence of 1011 F Street. He most certainly was. He testified that he was stabbed right where the video shows the feet of the defendant and Mr. Morao. And blood was located at the scene. So that is sufficient proof that the victim, Mr. Morao, was stabbed right there.

The fact that nobody sees a knife in the defendant's hand is of no moment because Mr. Morao has an obvious stab wound.

As to the defense theory that Mr. Morao was stabbed somewhere else by someone else, that is contradicted by the physical evidence of the blood trail leading from 1011 F Street back to the entrance to the Peactree Inn.

The theory that Mr. Morao was stabbed somewhere after he went to that location is contradicted by very credible testimony of Mr. San Coucie, who saw Mr. Morao enter the lobby, request paramedics while he was bleeding in the lobby. And Mr. San Coucie called paramedics, observed Mr. Morao exit the Peactree Inn back out to the sidewalk where paramedics arrived and treated him.

With regard to an allegation of self-defense, certainly that doesn't apply where a person denies that they stabbed the person. The defendant admits that he was there and that he disarmed Mr. Morao of the pool cue.

35

Mr. Morao testifies consistently with that.  That the defendant disarmed him of the pool cue.  At that point, the defendant was the only one who was armed.  Mr. Morao, who is a smaller individual, indicates that he punched the defendant.  But it's the People's position that he was doing that in self-defense.

Further, any force that Mr. Morao used at that point did not justify the deadly force that the defendant used when he stabbed him in the gut.

So at this point the state of the evidence is such that a reasonable jury would find the defendant guilty and reject what the defendant has claimed is the state of the evidence.

Id. at 1017-18.  After hearing the parties' arguments, the trial court concluded as follows:

In this case clearly there are issues as to who actually initiated the physical part of the altercation.  There are issues as to why it all happened.  And then there are issues related to what weapon, if any, the defendant had at the time.  They would be two individuals who were in the altercation were fighting.

However, there is sufficient circumstantial evidence that the People's case can be proved beyond a reasonable doubt if the jury finds that it has been proved beyond a reasonable doubt through either direct or circumstantial evidence.  Direct being the testimony of Mr. Morao.  Circumstantial by being the length of time between the first part of the altercation and the stabbing, which by all accounts seems to have taken only minutes.

So at this point, the Court cannot say that insufficient evidence has been presented in this case.  There's absolutely if the jury believes the facts elicited so far to find you guilty based on circumstantial evidence.

Id. at 1019.

Here, the jury ultimately agreed with the trial court.  A jury found Petitioner guilty of assault with a deadly weapon.  Lodgment 3 at 211.  The jury determined that Mr. Clements' and Mr. Morao's testimony were more credible than Petitioner's testimony.  It is the jury's responsibility "to decide what conclusions should be drawn from evidence admitted at trial" and

36

a reviewing court can overrule a jury verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. <u>Cavazos v. Smith</u>, 565 U.S. 1, 2 (2011) (per curiam). "The reviewing court must respect the exclusive province of the fact finder to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts" by assuming that the jury resolved all conflicts in support of the verdict. <u>United States v. Hubbard</u>, 96 F.3d 1223, 1226 (9th Cir. 1996); <u>Walters v. Maass</u>, 45 F.3d 1355, 1358 (9th Cir. 1995). A rational jury could have reasonably concluded that Petitioner was not in fear of his life or serious bodily injury because Petitioner testified that he was not worried about fighting Mr. Morao and because Petitioner had a pistol and knife in his possession during the fight. <u>See</u> Lodgment 1-9 at 1145-93. A rational jury also could have concluded that Petitioner used excessive force on Mr. Morao because Mr. Morao had been disarmed and sustained serious injuries. By finding Petitioner guilty of assault with a deadly weapon, the jury necessarily found that the prosecution met its burden. Put otherwise, by so doing, the jury necessarily found that Petitioner did not act in self-defense. <u>Vinh Quoc Ta v. Pliler</u>, 2008 U.S. Dist. LEXIS 123251, at *99-100 (C.D. Cal. Dec. 30, 2008) (finding sufficient evidence that the petitioner did not act in self-defense based on the jury's determination that the petitioner was guilty of the crime committed). As summarized above, there is overwhelming evidence supporting the jury's verdict. Accordingly, the Court **RECOMMENDS** that Petitioner's fifth ground for relief be **DENIED**.

### PETITIONER'S REQUEST FOR AN EVIDENTIARY HEARING

In his Traverse and Supplemental Traverse, Petitioner requests that the Court hold an evidentiary hearing on his claims. Traverse at 2; Supp. Traverse at 39. Rule 8(a) of the Rules Governing Section 2254 Cases provides that where a petition is not dismissed at a previous stage in the proceeding, the judge, after the answer, transcripts, and record of the state court proceedings are filed, shall, upon review of those proceedings, determine whether an evidentiary hearing is required. The purpose of an evidentiary hearing is to resolve the merits of a factual dispute.

17cv209-AJB (BLM)

Under 28 U.S.C. § 2254(e)(2), as amended by AEDPA, a district court presented with a request for an evidentiary hearing must first determine whether a factual basis supporting the petitioner's claims was developed in state court. McQuiggin v. Perkins, 133 S.Ct. 1924, 1934 (2013); see also Williams, 529 U.S. at 431; Baja v. Ducharme, 187 F.3d 1075, 1078-79 (9th Cir. 1999). If a factual basis was developed in the state court, Petitioner is entitled to a hearing if he establishes he "did not receive a full and fair opportunity to develop [the facts of his claim] in state court" and if "he has alleged facts that, if proven, would entitle him to habeas relief." Williams v. Woodford, 384 F.3d 567, 586 (9th Cir. 2004); see also Insyxiengmay v. Morgan, 403 F.3d 657, 670 (9th Cir. 2005) ("petitioner's allegations need only amount to a colorable claim"); Phillips v. Woodford, 267 F.3d 966, 973 (9th Cir. 2001) ("Where a petitioner raises a colorable claim [to relief], and where there has not been a state or federal hearing on this claim, we must remand to the district court for an evidentiary hearing") (internal citations omitted); Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011).

If a factual basis for a particular claim was not developed in the state court, the district court must determine whether the failure to develop the factual basis of the claim in state court was attributable to the petitioner. See Williams, 529 U.S. at 432 (explaining that "a failure to develop the factual basis of a claim is not established unless there is a lack of due diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel"); see also Cooper-Smith v. Palmateer, 397 F.3d 1236, 1241 (9th Cir. 2005). If the failure was attributable to the petitioner, the court must deny the request for an evidentiary hearing unless the petitioner establishes one of two narrow exceptions set forth in 28 U.S.C. § 2254(e)(2), which provides:

(d) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –

(A) the claim relies on –

(i) a new rule of constitutional law, made retroactive to cases on collateral

review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

Here, the Court finds that a factual basis for Petitioner's claims was developed in state court. This conclusion is supported by the record, which shows that each of Petitioner's cognizable claims was brought to the attention of and adequately developed in the trial court. For example, Petitioner's alleged Brady violation was discussed in detail before and during trial. See Lodgments 1-3 at 251-75; 1-4 at 408-09; 1-5 at 471-74; 1-7 at 718-71; 1-8 at 900-21, 923-24, 973-94, 1008; 1-9 at 1130-32, 1195-97. Petitioner's alleged Faretta violations were also adequately developed, partially due to Petitioner's diligence in providing "notice" to the trial court. See Lodgments 1-1 at 2-26; 1-3 at 251-74; see also ECF No. 17 at 51-52. Finally, facts were fully developed at trial to determine whether there was sufficient evidence to find that Petitioner did not act in self-defense. See Lodgments 1-6; 1-7; 1-8; 1-9. Thus, Petitioner received a full and fair opportunity to develop the facts of his claims in state court.

Moreover, Petitioner did not allege facts that, if proven, would entitle him to habeas relief. The facts necessary to evaluate Petitioner's claims exist in the present record and it is unlikely that an evidentiary hearing would yield any further information. Upon careful consideration, the Court has recommended that Petitioner's habeas petition be dismissed because it does not allege facts sufficient to entitle him to relief under 28 U.S.C. § 2254(d) on any of his claims. Accordingly, Petitioner's motion for an evidentiary hearing is **DENIED** because federal habeas relief is not warranted under § 2254(d) and Petitioner has not demonstrated he meets the conditions for obtaining an evidentiary hearing under § 2254(e)(2).

39

## PETITIONER'S REQUEST FOR JUDICIAL NOTICE

On July 17, 2017, Petitioner filed a request for judicial notice, asking the Court to take notice that Respondent does not dispute the existence of "at least one audio recording of prosecutorial witness Devon Michael Clements." ECF No. 28.

Under Federal Rule of Evidence 201(b), "a court may take judicial notice of 'matters of public record.'" Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001) (quoting Mack v. South Bay Beer Distrib., 798 F.2d 1279, 1282 (9th Cir. 1986)). Additionally, a court has authority to take judicial notice of a fact "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); see also Lee, 250 F.3d at 689-90.

An assertion by Petitioner that Respondent does not dispute the existence of audio recordings of a prosecutorial witness is not judicially noticeable. This statement is not a matter of public record because it is not "made publicly available by government entities." See Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010). The assertion also contains facts subject to reasonable dispute, and the authenticity and accuracy of Petitioner's statement has not been tested. See Fed. R. Evid. 201(b). The information that there is at least one audio recording of prosecutorial witness Devon Michael Clements is not a "generally known fact[]." Id. Because Petitioner's statement is not proper for judicial notice, the Court **DENIES** Petitioner's request.

## CONCLUSION AND RECOMMENDATION

The Court submits this Report and Recommendation to United States District Judge Anthony J. Battaglia under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California. For the reasons outlined above, the Court **DENIES** Petitioner's request for an evidentiary hearing. The Court also **DENIES** Petitioner's request for judicial notice.

In addition, **IT IS HEREBY RECOMMENDED** that the District Judge issue an Order

17cv209-AJB (BLM)

approving and adopting this Report and Recommendation **DENYING** the Petition for Writ of Habeas Corpus.

**IT IS ORDERED** that no later than, **September 27, 2017**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than, **October 18, 2017**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED**.

Dated: 8/29/2017

Hon. Barbara L. Major
United States Magistrate Judge

17cv209-AJB (BLM)